UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MOHAMMED KLITI,

                    *Petitioner*,

   - against -

RICHARD A. SAVAGE, Superintendent,
Gowanda Correctional Facility

                    *Respondent*.
-----------------------------------------------------X

**MEMORANDUM AND
ORDER**
07-CV-3168 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

On December 1, 2002, Mohammed Kliti was sentenced in the Supreme Court of the State of New York, Queens County, to an aggregate term of seven years, following his conviction by jury of first-degree robbery, second-degree robbery, and second-degree menacing.

Kliti's petition for writ of habeas corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254 is now before the Court, together with the state's papers in opposition (Doc. No. 4) and petitioner's reply to state's opposition (Doc. No. 7). For the reasons stated below, petitioner's application for habeas relief is DENIED and the petition is DISMISSED in its entirety.

## BACKGROUND

A.    <u>The Crime</u>

On March 24, 2001, at about 11:30 p.m., Kliti went into a bodega owned by Mohammed Ahmed at 32-02 34th Avenue in Long Island City, New York. (Transcript of Proceedings ("Tr.") at 301-304.) Kliti asked Ahmed for a soda and Ahmed directed him to the back of the store. Kliti continued to ask for assistance, at which point Ahmed walked to the back of the store to help him. (*Id*.) Thereafter, a white male, Vassilis "Billy" Moulavassilis, and an African American male, Naquain "Nene" Johnson, entered the store. (*Id*. at 306-07.) Johnson pointed a gun against Ahmed's neck. (*Id*. at 306.) All three men in the store then pushed Ahmed into the

1

bathroom. (*Id*. at 308.) While Johnson continued to hold the gun to Ahmed, Moulavassilis and

Kliti took $50 from the register, after which all three men left the store. (*Id*. at 308, 317-19.)

The police investigated this robbery as part of a pattern of robberies in the area. A man

named Jeffrey Artis reached out to the police regarding the robbery. (Tr. at 365.) Artis informed

the police that Johnson may have been involved in the robbery. The police then contacted

Johnson, who both confessed to the robbery in question and identified Kliti as an accomplice.

Johnson told the police where Kliti worked. The police arrested Johnson. (Tr. at 367, 430, 826-

27, 830.)

The day after Johnson was placed under arrest, the police visited Kliti at his place of

employment. Kliti went with the police voluntarily to the precinct for questioning on April 24,

2001. (Tr. at 368, 411.) With Detective Adam Heege in the room, Detective Daniel Lewis

administered *Miranda* warnings, and Kliti waived his rights. (*Id*. at 379-81.) Kliti told Lewis

about his involvement in the robbery and began writing a statement regarding the details of the

crime. (*Id*. at 383.) Although, according to Lewis, Kliti spoke English very easily and fluently,

Kliti began having difficulty writing and spelling, so Lewis suggested that he take over writing

Kliti's statement exactly as Kliti dictated it. (*Id*. at 386, 389.) Kliti, Lewis and Heege signed the

written statement. (*Id*. at 387.) The portion written by Kliti read:

> On Saturday March 20, at 11:30 p.m. me and Billy and Nene went to a grocery. I
> want [sic] inside and I asked the guy to come up to the back. Then Nene came in
> and stayed at the store with plastic gun. And then Nene and the guy start. . . . I
> hold Nene. And the guy and I let Nene go. And I pushed, bushed, [sic] the guy to
> the bathroom. . . . And I went outside and Billy went to the cashier.

(*Id*. at 389.) Any cross-outs in the portion written by Kliti were his own. The portion written by

Lewis read:

> On Saturday, March 24th at 11:30 p.m. me and Billy and Nene went to a grocery. The store was on 32nd Street and 34th Avenue. I went inside to the back and asked the guy to show me a kind of drink (Snapple). The guy came back to show it to me. Then Nene came inside with a plastic gun. He asked the guy to go down on the floor. The guy started laughing at Nene. Then guy started fighting with Nene. I was just looking at him. The guy picks up a big knife. He was going to stab Nene with it because Nene was down. I had to hold the guy and pushed him to the bathroom without hurting him. They didn't see nothing so I told Billy since he was stealing the money out of the cashier that I'm out of here. They came out running after me too. We ran into a building on Broadway and 32nd Street. Billy went outside to take a taxi. We all got into the cab and went to Le Club on 31st Street. We split $13 each inside the building on Broadway.

(*Id*. at 391.)

During the questioning, Kliti also signed a photo array, where Kliti identified Johnson as one of the people with whom Kliti committed the robbery. (*Id*. at 461-62.) Kliti also confessed to a second, different robbery. He confessed that he acted as a look-out for the other robbery and received $50 for so doing. (*Id*. at 862, 898.)

B.    Trial

Kliti, Johnson, and Moulavassilis were charged with robbery in the first degree, two counts of robbery in the second degree, and menacing in the second degree. (Aff. in Opp'n (Doc. No. 4) at ¶ 6.) Johnson and Moulavassilis pled guilty to robbery in the first degree. (*Id*. at n.1.) Kliti went to trial. He was tried in the Supreme Court of New York, Queens County before Judge Roman in November 2002.

1.    Defense Opening Statement

John Ciafone, Kliti's trial counsel, began his opening statement by noting that Johnson and Moulavassilis had pled guilty to the robbery in question, that Johnson had "admitted to holding a gun to the neck of store owner," and that "Moulavassilis admitted to taking the money." (*Id*. at 286-87.) Peter Romp, the Assistant District Attorney prosecuting the case, objected to Ciafone's statements. (*Id*.) The court sustained the objection, noting that "the other

two defendants are not before this court." (*Id*. at 287.) At sidebar, Ciafone insisted that he needed to address these topics or possibly call Johnson or Moulavassilis to stand because he believed Lomp would call Detective Lewis, who investigated the robbery, to testify that Johnson and Moulavassilis had told the police that Kliti also participated in the robbery. (*Id*. at 289-90.) However, when Judge Roman asked whether Lomp had such plans, Lomp responded: "No. I am aware of the Sixth Amendment. I don't see how I'll be able to do that." (*Id*. at 290.) Ciafone then indicated that if Lomp was not going ask Lewis regarding Johnson and Moulavassilis's confessions, he would do so himself to prove that Johnson and Moulavassilis gave different accounts of the incident. (*Id*. at 290-91.) The court told Ciafone that those confessions were inadmissible unless Ciafone calls Johnson and Moulavassilis as witnesses, and since they were not on his witness list, he could not continue with that line of argument. (*Id*. at 291-92.)

Ciafone then continued with his opening statement, telling the jury that petitioner was not present at the time of the robbery and a witness could corroborate this. (*Id*. at 292-93.) Lomp, however, objected and at sidebar noted that he has not been served with an alibi notice. (*Id*. at 293.) Ciafone admitted that he has never served alibi notice, that he was not calling an alibi witness, but rather a witness, Kliti's father, who was "going to say his son was home." (*Id*. at 294.) The court instructed Ciafone to not open with alibi testimony. (*Id*. at 294-95.) The court directed Ciafone to address any alibi issue Monday morning and that it would "accept any legal argument and any case law in support of this late request." (*Id*. at 352.) However, on Monday morning Ciafone announced that he would not attempt to call an alibi witness, but rather reserved the right to call Kliti's father – the person that Ciafone had intended to offer the alibi – to the stand. (*Id*. at 354.)

2.	The Prosecution's Case

The prosecution's main witnesses were Ahmed, the victim of the robbery and store owner, and Detective Lewis.  Ahmed recounted the facts of the robbery.  He explained that, on the night of March 24, 2001 at approximately 11:30 p.m., one customer walked in looking for a drink.  After Ahmed went to help the customer locate the drink, two more customers – one African-American male and one white male – walked into the store.  The African-American male put a gun to Ahmed's head, and three customers pushed Ahmed into the bathroom.  Ahmed testified that the first customer who came into the store looking for the drink looked "white" or "Spanish" and was approximately 30-32 years old.  (*Id*. at 311.)  After reporting the incident to the police, Ahmed rode around in a police car in the neighborhood looking for the perpetrators.  He did not spot any of them.  (*Id*. at 320.)  A month later, Ahmed went to the police station to view two line-ups, one with African-American males and one with white males.  (*Id*. at 321.)  He could not identify any of the perpetrators in these line-ups.  (*Id*. at 322.)  In the courtroom that day, Ahmed could not identify Kliti as one of the robbers.  (*Id*.)

Detective Lewis testified next.  Lewis explained how he came to learn that Kliti was involved in the robbery – through Johnson by way of Artis.  Lewis did not visit Kliti at his workplace, but first met with him when Kliti went to the police station.  (*Id*. at 368.)  Lewis began interviewing Kliti and then administered *Miranda* warnings, and Kliti stated and signed a form stating that he understood he was waiving each right.  Thereafter, Kliti gave Lewis a statement, which Kliti began writing but which Lewis completed writing because Kliti was having difficulties writing in English.  Lewis testified that he wrote, word-for-word, what Kliti dictated to him.  Kliti, Lewis, and Detective Heege signed the statement.  (*Id*. at 378-91.)  Lewis also testified that Kliti was able to communicate orally in English well, but he had difficulty

writing in English.  (*Id*. at 390.)  Lewis testified that he never confirmed whether three drunk individuals entered the store while the robbery was taking place.  (*Id*. at 393.)  Finally, Lewis confirmed that both Kliti and Johnson were placed in a line-up for Ahmed to view, but Ahmed did not identify either as the perpetrators of the robbery.  (*Id*. at 400.)

        3.        Cross-Examination of Detective Lewis

During his cross-examination of Detective Lewis, Ciafone elicited the following testimony.

First, Lewis testified on cross-examination that five people were arrested at about the same time as petitioner.  (*Id*. at 405.)  Specifically, Ciafone elicited testimony from Lewis that the police had arrested a number of individuals for committing a pattern of robberies, including Kliti.  (Tr. at 406-07.)  During Lomp's direct examination of Lewis, however, Lewis had only mentioned four individuals arrested for the robbery in question (Kliti, Johnson, Moulavassilis, and Artis).  (*Id*. at 364-366.)  Ciafone asked Lewis why he had not mentioned the fifth person during Lomp's direct examination, to which Lomp objected.  (*Id*. at 406.)  Judge Roman overruled the objection, and Lewis explained that he had not been asked questions pertaining to the fifth person.  (*Id*. at 406-07.)  Ciafone then asked: "But, detective, you've testified all of those persons were arrested for a robbery, right?"  (*Id*. at 407.)  Lewis replied: "No, I did not. All of these persons were arrested for several different robberies."  (*Id*.)

Ciafone asked again whether Johnson, Moulavassilis, and Artis had "committed more than one robbery," which Lewis answered yes.  (*Id*. at 428.)  Ciafone then elicited that Kliti was only charged with a single robbery.  (*Id*. at 428-29.)  Ciafone further elicited that Johnson was arrested earlier than petitioner, and asked Lewis whether Johnson had stated that petitioner was "involved in a crime."  (*Id*. at 429-30.)  Lewis answered, "It was indicated, yes, [Kliti] was

involved in these crimes." (*Id*. at 430.) Lewis then reaffirmed that Johnson "pointed to Mr. Kliti as someone involved" in the robbery. (*Id*.)

Ciafone also elicited testimony related to additional statements Kliti made when he was arrested. Earlier in the proceedings, Lomp warned the court and Ciafone that Kliti "had subsequent to his arrest made two separate written statements; one which related to this case; one of which related to another robbery not before this court." (*Id*. at 265.) The second statement was not produced to Ciafone pre-trial; Ciafone had not seen the other written statement until Lomp drew his and the court's attention to it. (*Id*. at 267.) Lomp explained that the court should be "mindful of it should the defense somehow open the door to that second statement," particularly when the prosecutor did not intend to introduce the statement in his case-in-chief. (*Id*.) The court then made certain that Ciafone saw the second statement "so he does not inadvertently open the door that should not be opened," and commented the second statement had "nothing to do with this trial." (*Id*. at 267, 268.)

During Ciafone's cross-examination of Lewis, however, Ciafone asked Lewis whether, aside from the statement relevant to the robbery in question, there were other statements that Kliti had made. (*Id*. at 447-48.) Upon request, Lomp offered some documents to help refresh Lewis's recollection. Ciafone presented those documents to Lewis, and Lewis then stated that Kliti made two additional written statements. (*Id*. at 449.) Ciafone did not ask Lewis about the content of those statements.

On redirect examination, Lomp questioned Lewis about the additional statements and sought to introduce them into evidence. (*Id*. at 460-67.) Though Ciafone objected, the court allowed the statements into evidence because Ciafone opened the door to their introduction. (*Id*. at 464.) Lomp elicited from Lewis that the first statement was a photo array signed by Kliti,

where Kliti identified Johnson as one of the people with whom Kliti committed the robbery for which he was charged. (*Id*. at 461-62.) The second statement was another written statement, unrelated to the robbery in question, taken by Lewis from Kliti and written in Lewis's hand. (*Id*. at 466.) At this juncture, Lomp did not elicit the contents of that second statement.

4. The Defense Case

Ciafone began the defense case by calling Kliti's father, Amar Kliti, to testify. Ciafone asked Amar whether his son – seventeen years old at the time of his arrest and nineteen years old at the time of the trial – had a curfew; Amar answered that his son's curfew was 10 p.m. and 11 p.m. on Saturdays. (*Id*. at 489.) Ciafone then tried to ask Amar whether his son was home the night of the robbery, March 24, 2001. Not having received alibi notice, Lomp objected. (*Id*. at 491.) Ciafone responded:

> Ciafone: I am not presenting him as an alibi. I'm asking him a question.
> The Court: Okay. And what do you anticipate the answer being?
> Ciafone: I don't know.
> The Court: This is your witness. You may not ask that question you're asking him.
> Ciafone: I didn't prep - -
> The Court: You're asking him was his son home at the time of the robbery; is that correct? That's clear alibi.

(*Id*. at 491-42.) The court precluded Ciafone from pursuing this line of questioning further. (*Id*.)

When cross-examining Amar, Lomp asked him, "What time did [Kliti] get home" on the night of March 24, 2001? (*Id*. at 524.) Amar answered, "This day he's home. Saturday, he's home. Because Friday – yeah, he's home. He's home 10:00. He's home." (*Id*.) When pressed on whether Amar could say with certainty that Kliti was home at 11:30 p.m. on March 24, 2001, Amar responded, "I believe he's home. I don't know what date exactly, but I believe he's home 10:00." (*Id*. at 523.)

On cross-examination, Lomp also elicited that Amar had pled guilty to a crime involving false checks and served time in jail. (*Id*. at 512.) On redirect, Ciafone elicited testimony that Amar successfully appealed that conviction. (*Id*. at 535.) However, on recross-examination, Lomp elicited testimony that Amar had pled guilty to the same crime after his conviction had been overturned on appeal. (*Id*. at 639-43.)

Kliti then testified in his own defense. Kliti testified that, when he was questioned by Lewis and Heege after his arrest, the detectives told him that Johnson and Moulavassilis had implicated him in the robbery and identified him in a photo array. (*Id*. at 559-60.) Kliti also stated that Lewis and Heege told him that the victim, Ahmed, identified him. (*Id*. at 560.) Additionally, Kliti stated that Lewis and Heege presented Kliti with five witness statements implicating Kliti in the robbery, but Kliti could not read them because he could not read English. (*Id*. at 551.) Kliti also testified that he did not read the *Miranda* rights he was waiving and did not understand them; he signed the waiver card because he felt like he had to. (*Id*. at 564-65.)

Kliti then testified that Lewis and Heege told him he would receive a fifteen-year sentence if he did not confess, but promised "youthful offender" treatment if he gave a statement. Kliti wrote a statement because he felt like he had to; as to the day of the robbery, Kliti "didn't even know what day, what robbery. I just put March 20th and [Heege] put March 24th, whatever." (*Id*. at 555.) Further, when asked what date he wrote down, Kliti testified "I don't know. He told me I did the robbery March-something, so I just put March 20th." (*Id*. at 568.) Then, according to Kliti, Lewis began writing the rest of the statement after Kliti "just gave him two words and he started writing most of it." (*Id*. at 569.) After Lewis finished writing the statement, Lewis did not read it back to Kliti. (*Id*. at 570.) Kliti signed the statement because he thought that, as a police officer, Lewis could not lie. (*Id*.)

Kliti also testified that, in sum, Johnson had a motive to falsely identify Kliti as being involved in the robbery.  Kliti knew of Johnson from seeing him around school.  (*Id*. at 548.) The day before Kliti was arrested, Kliti testified that Johnson came into the store where Kliti worked.  Johnson tried to buy tobacco and beer, but Kliti refused him because he did not have proper identification.  (*Id*. at 547.)  Kliti then stated that Johnson started threatening him.  (*Id*.) Johnson told Kliti that he would come back at night or the next day to beat Kliti up, jump him, and shoot him.  (*Id*. at 674.)  Kliti kicked Johnson out of the store, but Johnson came back again. Kliti kicked him out again, and Johnson did not come back.  (*Id*. at 548.)  The next day, Kliti was arrested.

While Johnson had a motive to falsely identify Kliti, Kliti testified that he did not know Moulavassilis.  When the detectives confronted Kliti with Moulavassilis's alleged identification, Kliti testified that he asked the detectives "who's Billy?" and that he told them he did not know Billy.  (*Id*. at 562.)  Kliti later testified that he knew Moulavassilis from "Steinway Street" and he recognized him in jail.  Whenever Kliti saw Moulavassilis, he did not talk to him.  (*Id*. at 682.)

Kliti also offered his own alibi.  He testified that he was home watching a movie with his two sisters and his mother the night of March 24, 2001.  He remembered the evening because earlier in the night, he was with his family at a friend's party downstairs in their building.  He stated that, at no time during that evening, did he go out.  (*Id*. at 571-73.)

Ciafone then presented Kliti with the various additional statements Kliti made.  As to the photo array where Kliti identified Johnson as one who committed the robbery in question, Kliti testified that Heege told him to write Johnson's name.  (*Id*. at 575.)  Kliti again testified that he signed five witness statements and three of his own statements:  the photo array, his confession, and his *Miranda* waiver.  (*Id*. at 579.)  He did not know what he was signing.  (*Id*.)  At no time

were these five witness statements that Kliti allegedly signed introduced into evidence; nor did they otherwise play a role in the course of his trial.

Kliti further testified that the day after he was arrested, he was placed in a line-up. (Id. at 601.) He sat with five other men for about half an hour. After the line-up concluded, Kliti testified that Lewis told Kliti that the victim "pointed you out in the line-up" as one of the robbers. (*Id*. at 604.)

Finally, Kliti testified that, at the time of his arrest, he did not know how to read and that his ability to write English was not good. (*Id*. at 608-09.) When Kliti first immigrated to the United States in 1996, he attended a school for immigrants as he could not speak English. (*Id*. at 940.) He transferred schools and completed the ninth grade at Bryant High School, where he was taught in English but took many English-as-a-Second-Language (ESL) courses. (*Id*. at 703.) Then he attended Long Island City High School, where he took math, global studies, and ESL courses. (*Id*. at 702-03.) Kliti stated that he failed all of his courses at Long Island City High School. (*Id*. at 701.)

On cross-examination, Lomp asked Kliti whether he lodged any charges of police misconduct or corruption with any authorities. (*Id*. at 617-20.) Kliti did not answer, stating that he did not understand the word "misconduct." (*Id*.) Lomp also asked Kliti whether, at any time during his criminal proceedings, he requested an interpreter because he did not understand English well. (*Id*. at 621.) Kliti answered, "I never asked because I told them I could understand." (*Id*. at 622.) Lomp also elicited testimony from Kliti that Kliti completed eight to ten English classes in high school between 1999 and 2001. (*Id*. at 704.)

When cross-examining Kliti about the night of the robbery, Kliti again testified that he was home with his sisters and mother after attending a party in the building. Lomp asked

whether Kliti ever attempted to put his sisters or mother in touch with Kliti's lawyers, and Kliti answered no. (*Id*. at 714.) On cross-examination, Kliti also maintained that Lewis and Heege pressured him into waiving his *Miranda* rights and signing the various statements, told him that the victim had identified him, and told him what to write in the confession.

     5.    The Rebuttal Case

The prosecution called Detective Heege on rebuttal. Heege testified that Lewis took the statement from Johnson, but Heege was present for it. (*Id*. at 770.) Lomp asked whether Johnson advised Heege and Lewis as to whom he may have committed the robbery with. (*Id*.) Heege answered:

> Heege: Yes, two other people.
> Lomp: Did he name them?
> Heege: Yes.
> Lomp: And what names did he provide?
> Heege: They were - -

(*Id*.) At this point, Ciafone objected, and the court sustained the objection. (*Id*.) Heege testified that he was present while Lewis read Kliti each *Miranda* right and that Kliti answered that he understood each right as it was read to him. (*Id*. at 775.) At this point, Kliti bursted out that Heege was lying, and the court instructed the jury to leave the room while Kliti calmed down. (*Id*.) When the jury came back, the court instructed the members to disregard Kliti's outburst. (*Id*. at 792.)

Heege then testified that neither he nor Lewis ever told Kliti that there were eyewitnesses against him (*id*. at 795), and that neither he nor Lewis threatened him with a fifteen-year sentence (*id*. at 796). While Kliti was giving his statement, Heege testified that all of the words that Lewis wrote were Kliti's own. (*Id*. at 797.) Heege also testified that Kliti identified Johnson in a photo array as one he did the robbery with. (*Id*. at 801.)

Ciafone cross-examined Heege the next day. Ciafone asked Heege, "Did Naquain Johnson ever accuse the defendant here, Mohammed Kliti, of being involved with any robberies that he was involved in?" Heege answered yes, and that Johnson identified Kliti through a photo array. (*Id*. at 826-27.) Such testimony slightly diverges from that offered by Kliti; Kliti testified that Heege and Lewis told him that Johnson identified Kliti in a line-up. (*Id*. at 559-60.) Heege testified that Johnson also confessed to committing the robbery at issue. (*Id*. at 830.)

Ciafone elicited testimony from Heege about the pattern of robberies that they were investigating and that the other robberies shared similar details with the charged one. Heege testified that Kliti confessed to being involved in some, but not all, of the robberies that took place around the same time as the robbery with which he was charged. (*Id*. at 844.) Lewis and Kliti discussed each robbery with which Kliti was involved, and Kliti gave statements as to each robbery. (*Id*. at 845.) Heege testified that Kliti "said he was involved in one of the robberies and that's when he gave the chain of events that took place. . . . He said which one he was involved with and we did one at a time." (*Id*.)

Ciafone also elicited testimony from Heege that Kliti wrote down the wrong date in his statement and that Lewis changed the date from the 20th of March to the 24th of March. Heege testified that he and Lewis explained to Kliti that it could not have been the 20th because that day was not a Saturday. Ciafone asked why Lewis, and not Kliti, changed the date, and Heege reiterated that it could not have been the 20th because that date was not a Saturday. (*Id*. at 855-56.)

Then, Ciafone asked Heege whether Kliti gave any other statements. Heege answered, "Yes. He gave another statement regarding a different location." (*Id*. at 861.) Ciafone elicited testimony from Heege furthermore that Kliti confessed to participating in a different robbery

where Kliti received $50 for acting as a look-out.  (*Id*. at 862.)  Ciafone moved to introduce the

statement, and Lomp objected.  (*Id*. at 875.)  Ciafone argued that the statement should be

admitted because, although it "causes the possibility of a jury believing maybe he did a multiple

of crimes," "the second statement should be more believable than the first statement."  (*Id*. at

877.)  He also argued that the second statement "may release him of the charges in this crime"

because the first statement – confessing to the charged offense – were not Kliti's words, as

evidenced by the fact that Lewis changed March 20th to the 24th.  (*Id*. at 878-89.)

Ruling on the request, the court observed:

> [I]f I view defense strategy in terms of how you have positioned the defense
> view of what's called the first confession.  And because of the close [n]exus in
> time of the second, we'll call it, apparent confession your reasons of relevance
> could incorporate a desire to have the jury see what happened during this one
> sitting that resulted in these writings.  However, as you said it's a very risky
> strategy to offer item 7, which is a confession, which purports to be a confession
> to a second robbery.

(*Id*. at 882.)  The trial judge thus understood that Ciafone's strategy was to show the jury the

differences between the two confessions in a close period of time in order to cast doubt on the

validity of the first confession.  An admittedly risky strategy, the trial judge asked Ciafone

whether he discussed it with his client and whether Kliti agreed to the strategy.  (*Id*.)  Ciafone

answered that Kliti wanted the second confession introduced.  And on the record, Kliti himself

stated that he agreed with the strategy.  (*Id*. at 883.)  The judge also made sure that Ciafone

explained the risks to Kliti, as well.  Kliti answered that he understood the risks, and determined

that those risks did not outweigh the benefits of introducing the confession.  (*Id*. at 884.)  The

court then allowed Ciafone to introduce the second confession into evidence.

Ciafone cross-examined Heege about the second confession, highlighting in particular the

fact that Kliti apparently gave the second confession only fifteen minutes after the first, and

during that fifteen minutes, also identified Johnson in the photo array. (*Id*. at 892-93.) Ciafone also elicited testimony from Heege that Lewis wrote the second confession because Kliti was unable to complete the first. (*Id*. at 891-92.) Then, Ciafone had Heege explain the gist of the second confession to the jury: "The gist of it is, they went to a store on Broadway, him and two other co-defendants. He stayed outside as a lookout and they robbed the place. And he got 50 bucks and the other guys got phone cards and cigarettes." (*Id*. at 898.)

      6.    Summation

In summation, Ciafone characterized this case as one of "different statements, different dates, different places," and argued that there remained "a serious question or a series of questions, possibilities, different scenarios that could have happened other than what the prosecution has presented." (*Id*. at 931-32.) He argued that Ahmed's inability to identify Kliti as the robber left a reasonable doubt as to Kliti's guilt. (*Id*. at 933-37.) He alluded to Johnson's motive in identifying Kliti as an accomplice, noting that the police "had a criminal accuse my client, a criminal who held a gun to people's heads." (*Id*. at 947-48.) He also argued that Kliti did not know what statements he was making in the confessions, as evidenced in part by Kliti's limited ability to read, write, and understand English and Lewis's changing of the dates. (*Id*. at 940-47.) Ciafone highlighted Kliti's lack of understanding of English, limited education, and limited knowledge of the criminal justice system, and juxtaposed that against the detectives pressuring Kliti to give and sign statements. (*Id*. at 940-43.) He also argued that it was impossible for Kliti to make two confessions and sign the photo array in the span of fifteen minutes. (*Id*. at 955-56.) Ciafone alluded to Kliti's alibi defense in summation, explaining that he called Amar to testify as a witness to corroborate Kliti's testimony. But Lomp reminded the jury in his summation that Kliti's father could not firmly testify that Kliti was home the night of

the robbery.  (*Id.* at 975.)  In closing, Ciafone described the police's and prosecution's handling

of the case as "sloppy" because the police and prosecution could not explain discrepancies

between Kliti's version of events and the detectives' version of events.

       7.    Verdict

The jury deliberated for two days and convicted Kliti of first-degree robbery, second-

degree robbery, and second-degree menacing.  (*Id.* at 1086-87.)  On December 17, 2002, Kliti

was sentenced to concurrent terms of seven years on the first-degree robbery count, three and

one-half years on the second-degree robbery count, and one year on the second-degree menacing

count.  (Aff. in Opp'n to Pet. at ¶ 3.)

       C.    <u>Procedural History</u>

On December 17, 2002, Kliti appealed his conviction, claiming that he was denied

Ciafone's effective assistance of counsel for (1) eliciting that Kliti's accomplices, Moulavassilis

and Johnson, had confessed, and that Johnson identified Kliti as an accomplice; (2) eliciting

testimony indicating Kliti and his accomplices participated in, and confessed to, a pattern of

robberies that were not charged; (3) eliciting otherwise inadmissible evidence, namely, Kliti's

signed photo array and confession to an uncharged robbery; and (4) failing to serve alibi notice

and abandoning the alibi defense mid-trial.  (Def.'s Br. to App. Div. (Doc. 1-3).)

The Appellate Division, Second Department denied Kliti's appeal.  First, the court noted

that "although defense counsel failed to serve an alibi notice, the alibi testimony was

nevertheless admitted into evidence."  *People v. Kliti*, 25 A.D.3d 568, 569 (2d Dep't 2006).

With respect to the introduction of Kliti's statement regarding the uncharged robbery, the Second

Department reasoned:

> [D]efense counsel pursued a clear trial strategy, based upon the fact that the
> defendant was implicated by his accomplice and the sole evidence of the

> defendant's identity as one of the perpetrators was a statement partially written in the investigating detective's handwriting. The defense counsel introduced into evidence a second statement which was entirely in the detective's handwriting. In that statement the defendant admitted to another crime for which he apparently was never charged. The second statement was admitted only after the court ascertained on the record that the admission of the second statement was part of the defendant's trial strategy and the defendant and his father agreed to that strategy. In summation the defense counsel argued that "[my] client is guilty of signing statements. That's all he's guilty of doing."

*Id*. Therefore, the Appellate Division held that Kliti was not denied the effective assistance of counsel.

Through counsel, Kliti sought leave to appeal his claim to the New York Court of Appeals. (Aff. in Opp'n to Pet. at ¶ 11.) The New York Court of Appeals denied leave on June 20, 2006. *People v. Kliti*, 7 N.Y.3d 758, 853 N.E.2d 254, 819 N.Y.S.2d 883 (2006). On August 1, 2007, Kliti filed the instant petition.

## STANDARD OF REVIEW

In deciding a federal habeas corpus petition, the Court must apply the standard of review set forth by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"). AEDPA requires a rigorous standard of review with regard to claims exhausted in state court. *See Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). Under AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Though the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are analyzed independently, both limit the source of the "clearly established law" to

the jurisprudence of the Supreme Court. *Williams*, 529 U.S. at 404-05, 412; *see also Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005).

A state court "adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (citation and internal quotation marks omitted). "When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Id.* This is because "federal courts recognize a conclusive presumption that, when presented with an express federal claim, a state court's decision rests principally upon an application of federal law even absent any express reference to federal authority." *Reznikov v. David*, No. 05-CV-1006, 2009 WL 424742, at *3 (E.D.N.Y. 2009) (citing *Sellan*, 261 F.3d at 314).

A state court decision is "contrary to" established Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if a state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405-06.

A state court unreasonably applies federal law where "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 413. The state court's application, however, must be "objectively unreasonable," *id.* at 409-10, which is a "higher threshold" than "incorrect." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at

410 (emphasis in original). A state court's application of federal law must be "objectively unreasonable." *Id.* at 409. Moreover, if a federal court "finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." *Howard*, 406 F.3d at 122 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993)).

AEDPA also codifies an exhaustion requirement, providing that a federal habeas court may not grant "[a]n application for a writ of habeas corpus . . . unless it appears that — (A) the applicant has exhausted the remedies available in the courts of the State . . . ." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is satisfied where the petitioner "fairly presented" his claim to an appropriate state court and, after that court denied relief, petitioner "utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981); *see also* 28 U.S.C. § 2254(c). Having raised his ineffective-assistance-of-counsel claim to the Appellate Division, and having appealed its decision to the New York Court of Appeals, Kliti satisfied the exhaustion requirement here.

## DISCUSSION

Kliti raises one claim in support of his habeas petition – ineffective assistance of counsel – and sets forth various grounds in support of this claim. Kliti argues that counsel was ineffective for (1) eliciting that Kliti's accomplices, Moulavassilis and Johnson, had confessed, and that Johnson identified Kliti as an accomplice; (2) eliciting testimony indicating Kliti and his accomplices participated in, and confessed to, a pattern of robberies that were not charged; (3) eliciting otherwise inadmissible evidence, namely, Kliti's signed photo array and confession to an uncharged robbery; and (4) failing to serve alibi notice and abandoning the alibi defense mid-trial. In opposition, the state argues that counsel's decisions to elicit this evidence were part and

parcel of the defense strategy and did not prejudice Kliti. Were this Court reviewing counsel's performance *de novo*, it may very well find that Kliti received ineffective assistance of counsel. But given the strict deference this Court must afford the Appellate Division's holding, this Court cannot conclude that the state court's decision was so unreasonable as to warrant granting the petition.

A. *Strickland* Standard

In order to demonstrate that his counsel was ineffective in violation of the Sixth Amendment, petitioner must satisfy a two-pronged test: first, "he must show that counsel's performance was deficient," and second, that "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011). The *Strickland* standard is "'highly demanding'" and "'rigorous.'" *Bennett*, 663 F.3d at 85 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)).

The performance prong of the *Strickland* test is satisfied only if, "in light of all the circumstances," particular "acts or omissions" by counsel made the assistance so ineffective as to be "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Further, courts must defer to counsel, and apply a "strong presumption" that the challenged acts or omissions of counsel "fall within the range of reasonable professional assistance" and "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. "'Judicial scrutiny of a counsel's performance must be highly deferential . . . [and] every effort [must] be made to eliminate the distorting effects of hindsight.'" *Cox v. Donnelly*, 387 F.3d 193, 198 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 689).

The prejudice prong of the *Strickland* test requires a showing of errors "so serious as to deprive" petitioner of a trial whose result is reliable. *Strickland*, 466 U.S. at 687. This prong requires demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Instead, the petitioner must show that the errors "more likely than not altered the outcome of the case." *Id*.

*Strickland* is clearly established federal law within the meaning of AEDPA, and thus petitioner may only obtain habeas relief on his ineffective-assistance-of-counsel claim if the state courts applied *Strickland* unreasonably. *See Williams v. Taylor*, 529 U.S. at 391 ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'").[1] To succeed on an ineffective-assistance-of-counsel claim on habeas review, it is not enough for the petitioner to show that the state court applied *Strickland* incorrectly. *Bell v. Cone*, 535 U.S. 685, 699 (2002). "Rather, he must show that [the court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id*. Finally, the Court recognizes that because "[t]he standards created

---

[1] Petitioner does not argue that the state court's decision was "contrary to" the *Strickland* standard. The Second Circuit has repeatedly held that, although New York's test for ineffective assistance of counsel under the state constitution differs from the federal *Strickland* standard, "New York['s] "meaningful representation" standard is not contrary to the *Strickland* standard. *See Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010) (citing *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003); *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001)). "Even if the errors are harmless in the sense that the outcome would remain the same, a defendant may still meet the New York prejudice standard by demonstrating that the proceedings were fundamentally unfair. This is not a novel view—New York state courts have repeatedly asserted that the New York standard is, in practice and in intent, more generous to defendants than the federal standard." *Rosario*, 601 F.3d at 125-26 (concluding that, properly applied, the New York standard is not contrary to Strickland).

by *Strickland* and § 2254(d) are both 'highly deferential," "when the two apply in tandem, review is 'doubly' so ." *Harrington v. Richter*, —— U.S. ——, 131 S. Ct. 770, 788 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)).

   B. *Strickland*'s Performance Prong

      1. Accomplice Identification

Kliti argues that Ciafone's performance was deficient under *Strickland* when Ciafone introduced otherwise inadmissible evidence that Johnson and Moulavassilis identified Kliti as an accomplice. First, Ciafone brought out the fact that Johnson and Moulavassilis had pled guilty to the robbery in question in his opening statement, and started to state that Johnson identified Kliti as an accomplice before Lomp objected. (Tr. at 286-87.) Lomp indicated that he would not examine either detective about these facts because he was "aware of the Sixth Amendment." (*Id.* at 290.) At this point, Ciafone further explained his strategy as wanting to show that the accomplices gave completely opposite accounts of what happened in order to undermine the prosecution's case. (*Id.* at 291.) Second, while cross-examining Lewis, Ciafone explored this theory of the defense further by asking Lewis whether Johnson had accused Kliti of being involved in the robbery. (*Id.* at 430.) Kliti argues that these errors were deficient under *Strickland* because they could not be the product of an informed, strategic choice. The state argues, in contrast, that these decisions were the product of a defense strategy that Ciafone pursued throughout the trial – *i.e.*, that Johnson was a vengeful accomplice who wanted to falsely implicate Kliti in the robbery. The Court agrees with the State and finds that the New York Appellate Division did not unreasonably apply *Strickland* when determining that Ciafone pursued a "clear trial strategy" in eliciting the above-evidence.

This case is similar to *Bethea v. Scully*, No. 86-CV-2221, 1987 WL 8088 (E.D.N.Y. Feb. 26, 1987). In that case, the petitioner argued that his trial counsel was ineffective for eliciting otherwise-inadmissible hearsay evidence, namely, that a witness to the crime in question told the investigating detective that the petitioner had participated in the alleged crime. *Id*. at *5-6. The Court concluded that the attorney "had legitimate tactical reasons for introducing the statement" by trying to use the statement to discredit the petitioner's confession to the police. *Id*. at *5. Specifically, trial counsel compared the inadmissible statement with the one that the petitioner gave to the police to show their similarities, thereby advancing the defense that the police fabricated both statements. *Id*. at *6. Similarly, here, Ciafone sought to introduce evidence that Johnson and Moulavassilis confessed to the charged robbery and that Johnson implicated Kliti in the same robbery for two reasons: first, to advance the theory that the police were under pressure to solve a pattern of robberies and second, to advance the defense that Johnson wanted to get back at Kliti for refusing to sell him alcohol. While these trial strategies were risky, as Ciafone acknowledged, this Court cannot conclude that the Appellate Division unreasonably applied *Strickland* when viewing them as legitimate tactical decisions to advance a reasonable trial strategy.

Nevertheless, Kliti urges that there was no need to develop a strategy to deal with otherwise-inadmissible evidence. Kliti points to Ciafone's colloquy with the court during opening statements, in which Ciafone indicated that he did not know that the Sixth Amendment would bar Lewis from testifying about Johnson's statement. This, Kliti argues, demonstrates that Ciafone's decision to introduce the Johnson statement was not the product of an informed, strategic choice.

Kliti relies upon *Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001) to support this argument. In *Dixon*, the court of appeals held that trial counsel's performance was deficient when he failed to object to the state's introduction of an eyewitness statement identifying the defendant as the murderer when that eyewitness had previously recanted his statement. The court concluded that trial counsel failed to object most likely because he was unaware of the state statute permitting such material to be introduced as substantive evidence. Therefore, counsel's decision not to cross-examine the eyewitness on the statement was not "sound trial strategy," but rather born of ignorance of the law. *Id*. at 703. The court of appeals reasoned that the state court unreasonably applied *Strickland* in this instance when focusing not upon the defense counsel's awareness of the statute, but rather on the "strategic choice" not to cross-examine the witness, particularly when the witness's statement was the "sole piece of direct evidence against" the defendant. *Id*.

*Dixon* is distinguishable because, notwithstanding any ignorance on his part, Ciafone pursued a strategy throughout the trial to show that Johnson had motives to falsely accuse Kliti of the crime. Counsel's error in *Dixon*, in contrast, could only be the product of ignorance of the law. Furthermore, the statement in *Dixon* was the only direct evidence against the defendant, and undermining its credibility was crucial to the defense. In contrast, Johnson's statement was not the only piece of evidence against Kliti; Kliti's confession was far more probative of his guilt. Therefore, while the *Dixon* court correctly concluded that the attorney's error clearly prejudiced the defendant, here, it was not objectively unreasonable for the Appellate Division to conclude that Ciafone's error with regard to Johnson's statement did not prejudice Kliti, as required by the second prong of *Strickland*.

2.  The Pattern of Robberies

Kliti also argues that Ciafone's performance was deficient under *Strickland* when Ciafone elicited testimony throughout the trial that the police were investigating a pattern of robberies and that Kliti was implicated in committing other uncharged robberies.  Specifically, Ciafone elicited testimony from Lewis that the police had arrested a number of individuals for committing a pattern of robberies, including Kliti.  (Tr. at 406-07).  Second, Ciafone elicited testimony from Heege about the pattern of robberies that they were investigating and that the other robberies shared similar details with the charged one.

Again, this Court cannot conclude that the Appellate Division unreasonably applied *Strickland* when determining that these decisions advanced the defense's "clear trial strategy."  Ciafone's decision to elicit this testimony did not arise "from oversight, carelessness, ineptitude, or laziness," but was rather the product of a decision – albeit an risky one – to show that the police were under pressure to solve a pattern of robberies, and thus had a motive to get Kliti to confess to the robbery.  *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).  For similar reasons, the court in *Crowder v. Green*, No. 05-CV-2556, 2005 WL 2678811 (E.D.N.Y. Oct. 20, 2005), denied the petitioner's habeas request.  There, the petitioner argued his defense counsel was ineffective for opening the door to the prosecution cross-examining the petitioner on his uncharged, criminal history.  The court held that the defense's theory for opening the door to this – by asking whether the petitioner had ever committed an assault – supported the petitioner's self-defense theory.  *Id.* at *8.   As such, counsel was not ineffective for pursuing a line of questioning that was perhaps a "questionable trial strategy."  *Id.*

Similarly, in *Pape v. Thaler*, 645 F.3d 281, 290 (5th Cir. 2011), the habeas petitioner argued that his counsel was ineffective for eliciting testimony from one of the petitioner's

sexual-assault victims about the petitioner's other bad acts. Counsel's reason for doing so was "'to let everything in' so the jury would become 'fatigued' by [the victim's] strange accusations and conclude that [the victim] lacked credibility or was mentally ill." *Id*. The *Pape* court held that the state court did not unreasonably apply *Strickland* in concluding that counsel was not ineffective because counsel "developed a reasonable trial strategy. . . . Although one may want to question some of the tactical decisions made by Pape's counsel, we may not, in hindsight, second-guess counsel's strategy regarding [the victim's] testimony merely because an alternative course of action existed during trial." *Id*. The court concluded that counsel's decision "resulted from an informed trial strategy and fell within the wide range of trial tactics that constitute reasonable assistance." *Id*.

*Crowder*, *Pape*, and this case are quite similar: in all, trial counsels' decision to elicit evidence about uncharged crimes was questionable, but reasonably supported the defense's theory of the case. Here, Ciafone pursued a strategy aimed at showing that Kliti could not have confessed to two robberies – and given complete written statements – in the span of fifteen minutes. Such a strategy "fell within the wide range of trial tactics that constitute reasonable assistance." *Pape*, 645 F.3d at 290. Therefore, this Court cannot conclude that the Appellate Division applied *Strickland* unreasonably when determining this decision was born of sound trial strategy.

### 3. Kliti's Other Statements

Third, Kliti argues that Ciafone's performance was deficient for eliciting the introduction of Kliti's signed photo array identifying Johnson as an accomplice and the second statement confessing to an uncharged robbery. For the same reasons that the grounds discussed above were not deficient, so too was the introduction of these statements part of a "clear trial strategy,"

and the Appellate Division did not unreasonably apply *Strickland* in so concluding. The state

court also noted that, "The second statement was admitted only after the court ascertained on the

record that the admission of the second statement was part of the defendant's trial strategy and

the defendant and his father agreed to that strategy." (*Id*.) Moreover, the state trial court ensured

that the decision to admit the second statement, in which Kliti confessed to an uncharged

robbery, was a strategic decision that Kliti and Ciafone made together. The fact that the decision

stemmed from a trial strategy is also evidenced in Ciafone's summation. There, he argued that

his client was only guilty of signing statements, not committing robberies. In other words,

Ciafone believed the second statement and the photo array, coupled with Kliti's inability to

understand English, evidenced that the police sought in any way to get Kliti (or others) to

confess to the robberies. Even Lomp understood the defense as Kliti trying to show that there

was a police conspiracy against him. (Tr. at 969.) Kliti's testimony to that effect shored up that

defense, and admission of the photo array and the second statement – produced within a fifteen-

minute span – counsel believed further supported the defense.

    The decision to elicit the contents of Kliti's *confession* to an uncharged robbery was born

of the same rationale Ciafone employed when deciding to elicit *testimony* regarding the

uncharged robbery. Indeed, the confession and the testimony of the detectives are in some ways

the same: they are both evidence of uncharged criminal conduct. Just as the courts in *Crowder*

and *Pape* held that the decision to elicit testimony about uncharged conduct was within the range

of trial strategies that constituted reasonable assistance, so too here was Ciafone's decision to

elicit the contents of Kliti's second confession. *See also Key v. Artuz*, No. 99-CV-161, 2002 WL

31102627 (E.D.N.Y. Sept. 16, 2002) (rejecting ineffective-assistance claim on habeas review

where defense counsel's failure to object to introduction of defendant's videotaped-admission to

uncharged conduct was part of counsel's reasonable trial strategy).  On these facts, this Court

cannot conclude that the Appellate Division unreasonably applied *Strickland* when finding that

the decision to admit the second statement and photo array were the product of clear trial

strategy.

4.   The Alibi Defense

Finally, Kliti argues that counsel was deficient for failing to serve alibi notice, as required

by N.Y. Crim. Proc. Law § 250.20, by presenting Kliti's father, Amar, to testify as to Kliti's

whereabouts the night of the robbery without prepping Amar, and abandoning the alibi defense

in summation even though Kliti testified to his alibi.  The State argues that the alibi defense was

adequately presented, and the decision to abandon it mid-trial was not deficient under *Strickland*

because the defense became less relevant once Ahmed could not identify Kliti as one who

committed the robbery in court and Amar could not definitely state that his son was home at the

time of the robbery.  This Court finds that counsel was not deficient in advancing, and then

abandoning, the alibi defense.

First, as the Appellate Division correctly concluded, counsel's failure to serve alibi notice

was of no consequence because alibi testimony from Amar was nevertheless admitted into

evidence and Kliti testified as to his alibi, as well.  Kliti's argument goes further, however.

He also argues that Ciafone was deficient for failing to prepare Amar to testify as to

Kliti's alibi.  But this argument also fails.  As the court in *Batten v. Griener*, No. 97-CV-2378,

2003 WL 22284187, at *12 (E.D.N.Y. Aug. 26, 2003) held, "Unless trial counsel intended to

elicit perjurious testimony from this witness, it is unclear how 'better preparation' would have

impacted this presumably truthful testimony."  In other words, Kliti has not shown that his father

would have testified differently had Ciafone prepared him.  Amar testified that he believed Kliti

was home the night of the robbery, but could not say so with absolute certainty. *See also Williams v. Phillips*, 297 Fed. Appx. 56, 58 (2d Cir. 2008) (summary order) (noting that pre-trial alibi witness preparation could not have remedied the weaknesses in the witness's testimony, and thus rejected *Strickland* claim on habeas review).

Third, Kliti contends that counsel was deficient for abandoning the alibi defense in his summation. As an initial matter, it is not entirely clear that counsel abandoned the defense during summation. Ciafone argued to the jury that he called Amar "to support the testimony given by the defendant here, Mr. Kliti." (Tr. at 954; *see also id*. ("I put my client on the stand. And he said he wasn't involved in this crime.").) Even if Ciafone abandoned the alibi defense, the decision to do so cannot be said to be deficient. Given the weakness of Amar's testimony, and the relative strength of the defense's other evidence – that Johnson had a motive to implicate Kliti and the police coerced Kliti into confessing in order to solve the pattern of robberies, particularly given that Ahmed could not identify Kliti – it was not deficient for Ciafone to emphasize these other arguments in summation, as he did. More importantly, changing or emphasizing other defense theories mid-trial is not deficient performance. The court in *Torres v. Stinson*, No. 97-CV-5310, 2000 WL 1919916 (E.D.N.Y. Dec. 29, 2000) rejected this same argument on habeas review. There, defense counsel opened by presenting a self-defense theory, but during trial advanced other theories – that someone else committed the alleged crime and that the defendant was justified in committing the crime. *Id*. at *4. Defense counsel also shifted strategies because the defendant chose not to testify, thereby greatly undermining the self-defense theory. *Id*. Just as the defendant's choosing not to testify in *Torres* necessitated a shift in defense strategy, so too did the relative weakness of Amar's testimony warrant a shift in the defense's main theory here. Coupled with Ahmed's inability to identify Kliti, this Court cannot

say that the Appellate Division unreasonably applied *Strickland* when rejecting Kliti's argument here.

"In short, th[ese] sort[s] of disagreement[s] with counsel's strategy is not enough to satisfy the first prong of the *Strickland* test." *Id*. (citing *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986)).

### C. *Stickland*'s Prejudice Prong

Even if Ciafone's performance was deficient for the reasons Kliti argues, Kliti must also show that but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. As outlined above, "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Instead, the petitioner must show that the errors "more likely than not altered the outcome of the case." *Id*. Kliti fails to meet this rigorous test, particularly in light of the deference this Court must give to the Appellate Division's conclusion, as mandated by AEDPA.

Assuming that Ciafone's errors, taken alone, or taken in the aggregate,[2] satisfied the first prong of *Strickland*, the Court still finds that the Appellate Division did not unreasonably conclude that the outcome would have likely been different had the errors not occurred. Had the alibi witness not been presented, had Kliti's confession to the uncharged robbery not come in, and had no testimony regarding his accomplices' involvement and identification of Kliti as an

_____

[2] Petitioner also suggests that, even if counsel's errors, taken alone, were not deficient under the first prong of *Strickland*, they must be viewed cumulatively, and doing so would demonstrate counsel's "fundamental lack of formulation and direction in presenting a coherent defense." *Stouffer v. Reynolds*, 168 F.3d 1155, 1164 (10th Cir. 1999). For purposes of the prejudice analysis under the second prong of Strickland, this Court views the errors above in the aggregate, and assumes that they evidenced counsel's deficient performance under the first prong of Strickland. *See Lindstadt*, 239 F.3d at 199 ("We . . . consider these errors in the aggregate."). Nevertheless, as discussed below, the Court finds that the errors, viewed in the aggregate, did not prejudice Kliti.

accomplice come into evidence, the jury would have still had ample grounds upon which to convict Kliti. Kliti signed a confession to the charged crime, and the facts contained in his confession were substantially similar to and consistent with the story of the crime that Ahmed told. Despite Ciafone's best efforts to show that the police coerced Kliti, or were simply under pressure to solve a pattern of robberies and wanted someone to confess to them, Kliti's testimony did little to undermine the reliability of the confession. Kliti's story was inconsistent with those of the detectives and contained unsupported, outlandish allegations; the jury had every right to believe their testimony over Kliti's.

The highly inculpatory nature of Kliti's confession, particularly the portion written in Kliti's own hand, and as corroborated by Ahmed's testimony, satisfied the Appellate Division that there was a reasonable probability that the outcome of the case would not have been different. This Court cannot say that, in so finding, the Appellate Division unreasonably applied *Strickland*. *See Overton v. Darwin Laclair*, No. 07-CV-4599, 2009 WL 2610763 (S.D.N.Y. Aug. 25, 2009) (holding that defendant's inculpatory statements, weighted against the relatively insignificant errors that the defense counsel committed, precluded the petitioner from showing that there was a reasonable probability that the outcome of his case would have been different); *Curry v. Burge*, No. 03-CV-901, 2004 WL 2601681, at *29 (S.D.N.Y. Nov. 17, 2004) ("[I]n light of the extremely strong evidence [including confession] . . . any deficiency by counsel would still not satisfy the second *Strickland* prong."); *Bramble v. Smith*, No. 96-CV-5905, 1998 WL 395265, at *20 (S.D.N.Y. July 15, 1998) (in light of defendant's confession, "any errors that counsel arguably made in this case were not so serious as to constitute prejudice" under *Strickland* ).

## CONCLUSION

For the foregoing reasons, Kliti's petition for a writ of habeas corpus is DENIED and the

petition is DISMISSED in its entirety.  The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 22,  2013

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge